**M. Ryan Casey (he/him), OSB # 152824**
ryan@rcaseylaw.com
THE CASEY LAW FIRM, LLC
358 Blue River Pkwy Unit E-417
Silverthorne, CO 80498
Tel: (970) 372-6509

*Local / Lead Counsel for Plaintiff and the Proposed Class*

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| AMANDA CURRY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAPESTRY, INC., a Maryland corporation; and COACH SERVICES, INC., a Maryland corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>Unlawful Trade Practices (28 U.S.C. § 1332)<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Amanda Curry ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants TAPESTRY, INC., a Maryland corporation; and COACH SERVICES, INC., a Maryland corporation ("Defendants") and makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## INTRODUCTION

1.      Plaintiff brings this class action under Oregon law on behalf of all consumers who, within the applicable limitations period, purchased one or more products at Defendants' Kate Spade Outlet ("KSO") store in Woodburn, Oregon, bearing a "comparable value" price.

2.      Defendants operate the KSO retail store at Woodburn Premium Outlets and substantially identical KSO stores throughout the United States, as well as the KSO website (katespadeoutlet.com). They also operate Kate Spade ("KS") mainline retail stores and the KS website (katespade.com).

3.      Nearly all products sold at KSO bear a "comparable value" price, which is a reference price that is always higher, often dramatically so, than the price at which the product is offered. Defendants advertise discounts of 50, 60, or 70 percent or more against these "comparable value" prices, creating the impression that consumers are receiving substantial savings on goods of significant value.

4.      Oregon law prohibits retail price comparisons unless the seller identifies the origin of the compared price and can demonstrate that the reference price reflects a bona fide offering by an identified or identifiable competitor in the seller's geographic market for substantially similar goods. ORS 646.883; OAR 137-020-0010(6)(c). Defendants' "comparable value" prices do not satisfy these requirements. The prices are set on a uniform, nationwide basis without any adjustment for the competitive landscape in any particular Oregon market, and no in-store advertisement identifies the origin of any "comparable value" price.

5.      Based on counsel's investigation, the "comparable value" prices bear no meaningful relationship to the actual transaction prices at which identifiable competitors offer

substantially similar goods at outlet malls in the same geographic area. For comparable products, competitors' actual selling prices are a fraction of Defendants' stated "comparable value" prices.

6.     Plaintiff purchased products from the KSO store in Oregon that bore "comparable value" price representations. Plaintiff brings this action on behalf of herself and all similarly situated consumers. Plaintiff seeks actual or statutory damages, injunctive relief, and declaratory relief under the Oregon Unlawful Trade Practices Act ("UTPA"), ORS 646.605 et seq., and, in the alternative, relief based on Defendants' unjust enrichment.

7.     Plaintiff does not allege fraud or any claim sounding in fraud. Liability under the UTPA turns on whether Defendants' price-comparison practices satisfy mandatory statutory conditions, without regard to intent. To the extent Plaintiff alleges that Defendants' price representations are "false" or "misleading," those terms are used in their statutory sense—*i.e.*, that the representations do not satisfy the conditions under which price comparisons are lawful— rather than as allegations of common-law fraud.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and one or more members of the proposed class is a citizen of a state different from Defendants.

9.     The Court has personal jurisdiction over Defendants in this proceeding because Defendants (a) regularly market and sell products to consumers in Oregon; (b) do substantial business in Oregon by advertising and selling products in the state, including at their KSO retail store location; (c) serve a market for their KSO products in Oregon; and (d) derive substantial revenue from customers based in Oregon. Plaintiff's claims arise out of Defendants' specific

contacts with this forum. Defendants' conduct was directed at Oregon consumers and occurred in Oregon, including the Oregon KSO retail store. Plaintiff purchased the products in Oregon and suffered economic injury in Oregon.

10.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendants would be subject to personal jurisdiction in this District if this District were a separate state, given that Defendants sold products to consumers in this District, including to Plaintiff. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendants' conduct giving rise to the claims occurred in this District, including Defendants' sale to Plaintiff. Venue is also proper in this District under 28 U.S.C. § 1391 because Plaintiff resides in this District.

11.     Divisional Venue is proper under LR 3-2(a) because a substantial part of the events or omissions giving rise to the claim occurred in Marion County, including Defendants' sale to Plaintiff.

## PARTIES

12.     Plaintiff is an individual consumer who, at all times material hereto, was a citizen and resident of Portland, Oregon.

13.     Defendant Tapestry, Inc., previously known as Coach, Inc., is incorporated in Maryland and maintains its principal place of business at 10 Hudson Yards, New York, 10001. In 2018, Defendant Tapestry, Inc. acquired Kate Spade & Company.

14.     Defendant Coach Services, Inc. is incorporated in Maryland and is a wholly owned subsidiary of Defendant Tapestry, Inc. Coach Services, Inc. acts as an operating subsidiary for Tapestry's KSO stores, and maintains its principal place of business at 10 Hudson Yards, New York, 10001.

15.    Plaintiff is informed and believes that all times material hereto and mentioned herein, each Defendant sued herein was the agent, servant, employer, joint venturer, partner, subsidiary, parent, division, alias, alter ego, co-conspirator, or aider-and-abettor of the other Defendants. Plaintiff is also informed and believes that, at all times, each Defendant was acting within the purpose and scope of such agency, servitude, employment, ownership, subsidiary, alias, and/or alter ego and with the authority, consent, approval, control, influence, and ratification of each remaining Defendant sued herein.

## FACTUAL ALLEGATIONS

**A.  Federal and Oregon law prohibit misleading retail price comparisons, which harm consumers.**

16.    Research demonstrates that retail discounts and promotional offers play a significant role in customer purchasing decisions. Retail "sale" messaging predictably increases demand for advertised goods and can affect transaction prices and purchasing volume. According to one survey, "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase."[1]  And "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount," while "80% [of consumers] said they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[2]

17.    Retailers know that consumers typically lack access to material information about a product's quality, provenance, and market comparators, particularly where those attributes are

---

[1] https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/.
[2]     https://www.prnewswire.com/news-releases/retailmenot-survey-deals-and-promotional-offers-drive-incremental-purchases-online-especially-among-millennial-buyers-300635775.html.

not verifiable at the point of sale.[3] Reference-price advertising functions as a pricing mechanism that can increase demand and raise transaction prices by creating the appearance of a bona fide comparative discount. When the reference price is fictitious, inflated, or unsubstantiated, the practice distorts the market benchmark against which the transaction price is presented and results in inflated transaction amounts and increased sales volume compared to a truthful, substantiated pricing regime.

18.     In addition to harming consumers, the practice of employing false reference prices also negatively affects competition in retail markets. A retailer's use of false reference prices constitutes an unfair method of competition and harms honest competitors that sell the same or similar products, or otherwise compete in the same market, using valid and accurate reference prices. Businesses that play by the rules—and the investors in those businesses—are penalized if the unlawful advertising practices of their competitors go unchecked.

19.     Federal and state courts have highlighted the harms that flow from false reference pricing practices. As the United States Court of Appeals for the Ninth Circuit explained: "Most consumers have, at some point, purchased merchandise that was marketed as being 'on sale' because the proffered discount seemed too good to pass up. Retailers, well aware of consumers' susceptibility to a bargain, therefore have an incentive to lie to their customers by falsely claiming that their products have previously sold at a far higher 'original' price in order to induce customers to purchase merchandise at a purportedly marked-down 'sale' price." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013).

---

[3] Phillip Nelson, *Information and Consumer Behavior*, Journal of Political Economy 78, no. 2, p. 311-312 (1970) ("Not only do consumers lack full information about the price of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain.").

Class Action Allegation Complaint          6

20.     Accordingly, federal and Oregon law both address the pernicious effects of misleading price comparisons. The federal scheme directly addresses the type of comparative pricing at issue in this Complaint. According to FTC regulations:

> [One] form of bargain advertising is to offer a reduction from the prices being charged either by the advertiser or by others in the advertiser's trade area **for merchandise of like grade and quality – in other words, comparable or competing merchandise – to that being advertised.** Such advertising can serve a useful and legitimate purpose when it is made clear to the consumer that a comparison is being made with other merchandise and **the other merchandise is, in fact, of essentially similar quality and obtainable in the area.** The advertiser should, however, be reasonably certain, just as in the case of comparisons involving the same merchandise, that the price advertised as being the price of comparable merchandise does not exceed the price at which such merchandise is being offered by representative retail outlets in the area. **For example, retailer Doe advertises Brand X pen as having "Comparable Value $15.00". Unless a reasonable number of the principal outlets in the area are offering Brand Y, an essentially similar pen, for that price, this advertisement would be deceptive.**

16 CFR § 233.2(c) (emphasis added). In short, when a retailer advertises a "comparable value" reference price, the retailer must be reasonably certain that the advertised comparison price does not exceed the actual, prevailing price at which essentially similar goods are actively offered by its principal competitors in the area. *Id.*

21.     Oregon takes a more stringent approach: retail price comparisons are *presumptively unlawful* and permitted only if the seller can prove it satisfies one of a few enumerated exceptions. Under the UTPA, a seller may not make "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions." ORS 646.608(1)(j). The Legislature added further specificity: as a general rule, "a price comparison in an advertisement" is *unlawful unless* (1) "[t]he seller clearly and conspicuously identifies in the advertisement the origin of the price that the seller is comparing to the seller's current price," (2) "[t]he price comparison is in

compliance with ORS 646.608(1)(j) and the rules adopted under ORS 646.608(4)," and (3) "compliance is established based on facts provable by the seller." ORS 646.883. A violation of ORS 646.883 or 646.885 is unlawful under the UTPA. *Id.* 646.608(1)(ee).

22.    To supplement these statutory prohibitions, the Oregon Attorney General promulgated a rigorous administrative rule that is intentionally stricter than the FTC's guidelines. In adopting the rule, the Attorney General concluded that the FTC "guidelines are not satisfactory for either the consuming public, or the business community, because they are too general and contain too many vague terms." Order Adopting Rules 20-010, 20-015, and 20-030 Pursuant to the UTPA, at 4 (July 20, 1976). Oregon's price comparison rule was therefore adopted to provide a "precise standard" with practical guidance for interpreting ORS "646.608(1)(j) [which prohibits] misrepresentations regarding the reasons for, existence of, or amounts of price reductions." *Id.* at 2. The rule itself confirms its purpose: "This rule is intended to define types of price comparisons which are in violation of that section, by establishing permissible types of reference price advertising." OAR 137-020-0010(2).

23.    Oregon's administrative rule also begins with a prohibition: a seller may not "represent[] that goods are available for sale or lease by it at an offering price less than a reference price unless such reference price comes within any one of the [enumerated] exceptions." OAR 137-020-0010(6). The rule establishes seven permissible types of reference price advertising. *See* OAR 137- 020-0010(6)(a)–(g). A reference price is per se deceptive unless it fits squarely within one of the seven exceptions.

24.    The exception in subsection (6)(c) allows comparable value pricing only when "an *identified or identifiable competitor* is or has in the recent regular course of its business offered to make good faith sales of *the same or similar goods*" at the advertised reference price. OAR 137-

020-0010(6)(c) (emphasis added). To qualify as "similar," the "goods associated with a reference price" must be "*similar in each significant aspect*, including size, grade, quality, quantity, ingredients, utility and operating characteristics, to the offered goods." OAR 137-020-0010(5)(g) (emphasis added). A "competitor" is "a retail outlet in the person's *geographic market area* with whom the person *in fact competes for sales*." OAR 137-020-0010(5)(c) (emphasis added). There is no exception that permits a seller to determine a comparative price based on its opinion of an item's value. Nor may a seller rely on the price of higher-grade merchandise or on atypical prices outside the seller's genuine competitive market.

25.     Together, Oregon's price-comparison statutes and rules make clear that price comparison advertisements are prohibited in Oregon unless *all* of the following criteria are satisfied: (a) the reference price reflects a bona fide price, (b) offered by a true local competitor, (c) in the recent regular course of its business, (d) for an item that is similar in each significant aspect, and (e) the origin of the price is clearly and conspicuously displayed on the advertisement. Further, sellers must be able to show their work, as "compliance is established based on facts provable by the seller." ORS 646.883(2).

26.     The UTPA also prohibits businesses from making false or misleading representations of fact concerning the offering price of, or the person's cost for goods, *id.* 646.608(1)(s); representing that goods have characteristics that they do not have, *id.* 646.608(1)(e); advertising goods with intent not to provide the goods as advertised, *id.* 646.608(1)(i); and any other unfair or deceptive conduct in trade or commerce, *id.* 646.608(1)(u), which may be specified in regulations promulgated by the Oregon Attorney General.

**B. Defendants employ a pervasive and systemic fake discount scheme in violation of federal and Oregon law.**

27.    Defendants employ a standardized pricing model at KSO stores under which merchandise is offered for sale at a stated discount off a higher reference price described as a "comparable value" price. The reference price appears on price tags, sales receipts, and other advertisements and is presented as a benchmark against which the transaction price is discounted.

28.    Defendants always (or almost always) sell made-for-outlet merchandise ("MFO Merchandise") at KSO stores at prices significantly lower than the "comparable value" prices. This scheme follows a simple pattern: (1) each KSO product features an inflated "comparable value" reference price; (2) the consumer has no way of determining the origin or basis for the "comparable value" price or how it was chosen or calculated based on information provided by Defendants; (3) the products are consistently offered at some substantial discount to the "comparable value" price, whether by way of a limited-time storewide promotion, a promotion that applies to particular categories of products (e.g., sweaters or outerwear), or simply a lower price for a particular item that appears to reflect a discount off the reference price; and (4) while the terms of the applicable promotions change frequently, the "comparable value" price is rarely, if ever, the applicable price for any KSO products.

29.    KSO's discounts are based on the false premise that KSO products should be "valued" at a higher price than their current sale price. In truth, the "comparable value" prices are unmoored to any actual price at which actual competitors in the same geographic area are offering "similar goods," and these prices create the appearance of a genuine comparative discount and operate to increase demand and support higher transaction prices.

30.    By offering a continuous series of promotions, Defendants present transaction prices as time-limited bargains measured against higher reference prices that are not bona fide.

This promotional structure creates time pressure at the point of sale by conditioning the advertised transaction price on a purported discount from the stated reference price, even though the reference price is not substantiated and rarely (if ever) functions as a real offering price for MFO Merchandise.[4]

31.     The "comparable value" prices do not appear to be tied to actual offering prices by true competitors selling substantially similar goods in the same geographic area. However, the facts necessary to substantiate the origin and accuracy of the advertised reference prices are exclusively within Defendants' possession, custody, and control.

32.     The comparable value reference prices used at the Woodburn KSO store are set pursuant to a centralized, nationwide pricing policy. The same reference prices appear on identical merchandise sold at Defendants' outlet stores in other states, without adjustment for local market conditions, competitors, or geographic differences. Neither the price tags nor other in-store materials disclose how the comparable value reference prices are determined, what products or retailers (if any) are used as comparators, whether the reference prices correspond to any actual

---

[4] Even if KSO did previously offer its merchandise at the "comparable value" price for some short period of time, that limited offering would not legitimize the practice. *See, e.g.*, OAR 137-020-0010(6)(a) ("The reference price is stated or readily ascertainable, and is a price at which the person, in the regular course of its business, made good faith sales of the same or similar goods or, if no sales were made, offered in good faith to make sales of the same or similar goods, either: (A) Within the preceding 30 days; or (B) At any other time in the past which is identified."); *see also* 16 C.F.R. § 233.1(a) (requiring that a comparison reference price be the "price at which the article was offered to the public on a regular basis for a reasonably substantial period of time"); *see also* 16 C.F.R. § 233.3(a) ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.") (emphasis added); 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price.").

offering prices in the same geographic market, or whether the reference prices reflect Defendants' own prices, competitor prices, or subjective valuations.

33.     While KSO's website does not provide any explanation as to how "comparable values" are determined, the website for Coach Outlet (another outlet store operated by Defendants) states a "comparable value" policy that is incompatible with Oregon law. It states: "The Comparable Value is an indication of value based on the quality of the material used, our commitment to craftsmanship and the high standards demanded by Coach and initial prices charged for similar products in the market. The Comparable Value is not intended to be a representation of a sale or of savings versus any particular product on a particular day. At Coach Outlet we strive to provide our customers with a luxury shopping experience and are pleased to offer product at lower prices than the Comparable Value." There, the "comparable value" prices are merely an "indication" of value based on an apparent qualitative assessment of the goods and the "initial prices" for similar products. Defendants (through the Coach Outlet brand) further disclaim that the "comparable value" is "a representation of a sale or of savings versus any particular product on a particular day," effectively conceding that the reference price is not anchored to any specific competitor's offering price for any specific product at any specific time, which is precisely what OAR 137-020-0010(6)(c) requires. To the extent these statements apply to KSO, by referencing "initial prices charged for similar products in the market" without identifying any geographic market, any specific competitor, or any specific product, this policy confirms that Defendants' "comparable value" prices are nationally determined figures untethered to local market conditions. It also reasonably suggests the "initial prices" may be based on artificially inflated "comparable value" prices offered by other outlet retailers, which do not reflect actual offering prices.

Class Action Allegation Complaint                    12

34.    Defendants cannot avoid Oregon's price comparison requirements by claiming that MFO Merchandise is unique or exclusive. Defendants chose to use "comparable value" pricing in Oregon, which, by definition, represents that comparable goods exist in the market at or near the stated reference price. OAR 137-020-0010(6)(c). To the extent no substantially similar goods are offered at prices approaching Defendants' stated "comparable value" prices, the "comparable value" label is itself a false or misleading representation of the characteristics and value of MFO Merchandise.

35.    Neither the price tags for MFO Merchandise nor any other in-store signage, placard, poster, or point-of-sale material at the one KSO retail store in Oregon identifies the origin of the "comparable value" price for any specific product. No in-store material identifies the competitor, if any, whose price was used as the basis for the "comparable value" comparison. No in-store material identifies the specific product, if any, that was used as the comparator. No in-store material identifies the geographic market in which any comparison was conducted. And no in-store material ties any particular "comparable value" price to a bona fide offering price by an identified or identifiable competitor in the seller's geographic market area for substantially similar goods, as required by ORS 646.883(1) and OAR 137-020-0010(6)(c).

36.    To the extent Defendants display or have displayed any general signage, placard, or notice in its Oregon KSO store purporting to describe how "comparable value" prices are determined, any such signage is a general statement of corporate policy and does not satisfy ORS 646.883(1)'s requirement that the seller identify the origin of the compared price in the advertisement. A generalized description of a nationwide pricing methodology—such as a statement that "comparable value" prices are based on prices at which similar merchandise has been offered by the seller or other retailers—does not identify the origin of any particular price,

does not name an identified or identifiable competitor, and does not anchor the comparison to the seller's geographic market area. Such a statement is a self-referential and unverifiable description of an internal corporate process, not a disclosure of the "origin" of a price within the meaning of ORS 646.883(1).

37.     While the basis for Defendants' "comparable value" calculations is unclear, the prices do not correlate to substantially similar goods sold by other stores at the Woodburn Premium Outlets or similar retailers in the area. Instead, KSO's "comparable value" prices are more consistent with main-line KS product prices and the prices of similar products offered by *KS's* direct competitors, as opposed to regular, nondiscounted prices of comparable KSO products or the prices of similar products sold by *KSO's* competitors. But KS and KSO do not compete with one another for customers. They are owned and operated by the same company, target distinct markets, and sell different product lines.

38.     The MFO Merchandise sold at Defendants' KSO store is manufactured specifically for outlet distribution and differs from Defendants' mainline KS merchandise in overall quality. Despite these differences, the comparable value reference prices signal equivalence to higher-quality products sold by Defendants' mainline KS stores and by other retailers selling higher-quality goods.

39.     While KSO's "comparable value" prices may be based upon prices for *similar-looking* styles sold at KS stores or the stores of KS's direct competitors, such a comparison is improper because KS and KSO are not competitors. The two stores are commonly owned by Defendant Tapestry and do not compete in any economic sense, whether in Oregon or elsewhere. Rather, they are different product lines that cater to different customer segments. Companies that employ Defendants' model of producing different products at different price points for their

"mainline" and "factory outlet" locations do so to expand market reach to different customer segments, not to erode or cannibalize higher-price sales at the mainline stores. Factory stores serve a different segment and help introduce the brand to consumers who may not shop at mainline stores. In addition, customers who shop at mainline stores are seeking different quality and design attributes than outlet or factory store customers, who tend to be more budget conscious. Mainline and factory stores are complementary rather than competitive sales channels, and there is limited crossover between the respective customer bases.

40.     There is no KS retail store in Oregon. The single KSO retail store location in Oregon is located in Woodburn at an outlet shopping mall that includes stores like Coach Outlet, Marc Jacobs Outlet, Michael Kors Outlet, and Tory Burch Outlet. Those stores (other than Coach Outlet, which is owned by Tapestry) are in actual competition with KSO in the market for made-for-outlet handbags and leather goods.

41.     The products offered by KS and KSO are not similar in each significant aspect. Defendants' KS products and products sold by KS's competitors are of a higher quality than KSO items, which are made to a lower standard to be sold at a lower cost.

42.     Relatedly, KSO's "comparable value" prices exceed the prices at which similar merchandise is being offered by representative retail outlets in the area.  KSO's closest competitors in the state include Michael Kors Outlet.

43.     Based on counsel's investigation, KSO's "comparable value" prices are not derived from, and materially exceed, the prices at which substantially similar goods are offered for sale by competitors in the geographic market during the same time period.

44.     Based on counsel's investigation, KSO assigns "comparable value" prices to wallets, handbags, and accessories that consistently exceed the prices at which substantially similar

goods are offered for sale by identifiable competitors in the same geographic area during the same period. The specific basis, if any, for KSO's "comparable value" prices is uniquely within Defendants' possession. But whatever the basis, the "comparable value" prices cannot be reconciled with observable market pricing for substantially similar goods.

45.    For example, the Lena Large Continental Wallet sold by KSO and depicted below bears a stated "comparable value" price of $239. On December 15, 2025, KSO offered the wallet for $79—representing a purported discount of approximately 67 percent from the stated reference price—before applying an additional 25 percent promotional discount, resulting in a final offering price of $59.25 on that date.



46.    But KSO's use of a $239 "comparable value" price for the Lena Large Continental Wallet does not reflect the price at which substantially similar goods are offered for sale by identifiable competitors in the geographic market. Instead, the reference price materially exceeds

observable market prices for comparable outlet-grade wallets sold by actual competitors at the same shopping center.

47.    On the same date, Michael Kors Outlet—an identifiable competitor located at the same Woodburn Premium Outlets shopping center—offered a substantially similar leather continental wallet, the Large Pebbled Leather Continental Wallet, for $47.20. The item was in stock and available for purchase on that date at the Woodburn location of Michael Kors Outlet. Based on Google Shopping price-tracking data, the Large Pebbled Leather Continental Wallet was offered for sale at prices ranging from approximately $47.20 to $59.00 in December 2025. The Michael Kors Outlet wallet is substantially similar to the Lena Large Continental Wallet sold by KSO in all relevant respects, including overall size, function, construction, materials, and intended use. Both products are leather continental wallets designed for everyday consumer use, feature multiple card slots and interior compartments, and are marketed to outlet-store consumers shopping for discounted handbags and leather accessories at Woodburn Premium Outlets. The Michael Kors Outlet wallet was not a clearance item, liquidation item, or discontinued product. Rather, it was offered as part of Michael Kors Outlet's regular outlet pricing practices.

48.    On the same date, the Fossil Outlet location at Woodburn Premium Outlets offered a substantially similar item, the Fossil Outlet Women's Emery Large Snap Bifold, at a price of $50. The item was in stock and available for purchase on that date at the Woodburn location of Fossil Outlet. The Fossil Outlet wallet is substantially similar to the Lena Large Continental Wallet sold by KSO in all relevant respects. It is crafted with a leather exterior featuring gold hardware and includes five credit card slots, two slide pockets, and a zipper compartment.

49.    As another example, the Madison Saffiano East West Leather Large Laptop Tote sold by KSO and depicted below bears a stated "comparable value" price of $499. On December

17, 2025, KSO offered the tote bag for $169—representing a purported discount of approximately 66 percent from the stated reference price.



50.    On the same date, Michael Kors Outlet offered a substantially similar item, the Voyager Large Saffiano Leather Tote Bag, for $95.20. The item was in stock and available for purchase on that date at the Woodburn location of Michael Kors Outlet. Based on Google Shopping price-tracking data, the Michael Kors Outlet Voyager Large Saffiano Leather Tote Bag was offered for sale at prices ranging from $95.20 to $159.00 from October 2025 to December 2025. The Michael Kors Outlet tote bag is substantially similar to the Madison Saffiano East West Leather Large Laptop Tote sold by KSO in all relevant respects. Both products are large, 100 percent Saffiano leather tote bags of similar size marketed to outlet-store consumers shopping for discounted handbags and leather accessories at Woodburn Premium Outlets. The Michael Kors Outlet tote bag was not a clearance item, liquidation item, or discontinued product.

51.     This contemporaneous offering demonstrates that KSO's use of a $499 "comparable value" price for the Madison Saffiano East West Leather Large Laptop Tote does not reflect the price at which substantially similar goods are offered for sale by identifiable competitors in the Woodburn geographic market. Instead, the reference price materially exceeds observable market prices for comparable outlet-grade wallets sold by actual competitors at the same shopping center.

52.     As a further example, the Carey Quilted Mini Crossbody sold by KSO and depicted below bears a stated "comparable value" price of $329. On December 18, 2025, KSO offered the item for $119—representing a purported discount of 64 percent from the stated reference price.



53.     On the same date, Michael Kors Outlet offered a substantially similar item, the Jet Set Large Leather Crossbody Bag, for $79.20. The item was in stock and available for purchase on that date at the Woodburn location of Michael Kors Outlet. Based on Google Shopping price-tracking data, the Michael Kors Outlet Jet Set Large Leather Crossbody Bag was offered for sale at prices ranging from $79.20 to $99.00 from October 2025 to December 2025. The Michael Kors

Outlet Jet Set Large Leather Crossbody Bag is substantially similar to the Carey Quilted Mini Crossbody sold by KSO in all relevant respects. While the product names differ ("mini" vs. "large"), both products measure approximately 8-9 inches wide and 4-5 inches tall. Both products have a 100 percent leather exterior and are marketed to outlet-store consumers shopping for discounted handbags and leather accessories at Woodburn Premium Outlets. The Michael Kors Outlet bag was not a clearance item, liquidation item, or discontinued product.

54.     As a further example, the Madison Willow Mini Crossbody sold by KSO and depicted below bears a stated "comparable value" price of $299. On December 18, 2025, KSO offered the item for $69—representing a purported discount of 64 percent from the stated reference price.



55.     On the same date, Michael Kors Outlet offered a substantially similar item, the Jet Set Large Saffiano Leather Crossbody Bag, for $44.00. The item was in stock and available for purchase on that date at the Woodburn location of Michael Kors Outlet. Based on Google Shopping price-tracking data, the Michael Kors Outlet Jet Set Large Saffiano Leather Crossbody Bag was

offered for sale at prices ranging from $44.00 to $59.00 from October 2025 to December 2025. The Michael Kors Outlet Jet Set Large Saffiano Leather Crossbody Bag is substantially similar to the Madison Willow Mini Crossbody sold by KSO in all relevant respects. While the product names differ ("mini" vs. "large"), both products measure approximately 8-9 inches wide and 4-5 inches tall. Both products have a 100 percent Saffiano leather exterior with gold hardware and are marketed to outlet-store consumers shopping for discounted handbags and leather accessories at Woodburn Premium Outlets. The Michael Kors Outlet bag was not a clearance item, liquidation item, or discontinued product.

56.     Nothing about the competitor offerings described above was atypical, short-lived, or outside the competitors' recent regular course of business. Even after typical holiday sales ended in January 2026, none of the prices listed above ever increased to KSO's "comparable value" price.

57.     This is the type of investigation Defendants themselves have identified as relevant to evaluating "comparable value" pricing. In ongoing California litigation involving the same pricing practices, Defendants have stated that KSO's "comparable value comparisons" are a "distinct category of advertising" governed by 16 C.F.R. § 233.2(c). *See* Demurrer to the Second Amended Class Action Complaint at 9, 18, *Slater v. Tapestry, Inc.*, JCCP Case No. 5371 (Cal. Super. Ct., L.A. Cnty. Oct. 13, 2025). Defendants further explained that, unlike former-price advertising, "*comparable value* advertising … is, by definition, concerned with the value of *similar products in the market*," rather than the seller's own historical prices. *Id.* at 10–11. While not dispositive of any Oregon law issue, Defendants argued that whether "comparable value" pricing is deceptive turns on facts concerning market prices charged by competitors, faulting plaintiffs for failing to allege "how comparable and competing items are valued or priced by other retailers." *Id.* at 24.

58.     Defendants also represent that MFO Merchandise has characteristics that they do not have by anchoring the products with a monetary "value" attributable to superior goods. Based on investigation of counsel, it is unclear what actual products (if any) were chosen as bases for comparison for the Products purchased by Plaintiff, but they do not correlate to prices offered by sellers such as Coach Outlet or Michael Kors Outlet.

**C.  Plaintiff's shopping experience and purchase**

59.     On November 8, 2025, Plaintiff visited the KSO retail store location at Woodburn Premium Outlets in Woodburn, Oregon. During that visit, Plaintiff purchased two items (the "Products").

60.     The Products were MFO Merchandise with advertised "comparable value" prices on the price tags, which were denominated in both Canadian Dollars (CAD) and United States Dollars (USD). The advertised discounts and effective prices for the Products were calculated by reference to the stated "comparable value" prices. There were prominent signs on the KSO store's windows and posted throughout the store advertising large percentage-off discounts and savings. Plaintiff reviewed the product tags and in-store signage, which presented the Products as discounted from stated "comparable value" prices.

61.     Plaintiff purchased the Carey Quilted Mini Crossbody bag (item number KM531) (the "Carey Bag") with a ticketed "comparable value" price of $329.00, as shown in the image of the price tag below. Plaintiff paid $78.96 for the Carey Bag, representing an apparent 76 percent discount. The comparable value appeared on the product's price tag and receipt, functioning as the benchmark against which the claimed savings were calculated in both in-store representations and on the sales receipt. Neither the price tag for the Carey Bag nor any in-store signage identified what products, retailers, or prices were used to derive the $329.00 "comparable value" price.



walletonchain
KM531
smooth quilted
black (001) BLK
carey

1  96021 68184  4

Take good care. Here's how.
Prenez-en bien soin. Voici comment.
请妥善维护。这里是具体做法。
お手入れ方法はこちらをご覧ください。

Comparable Value          CAD $409.00

                          USD $329.00

62.     The Carey Bag is also sold on KSO's website, as shown in the image below.



63.     Based on the website description, the Carey Bag measures 8.0 inches long, 4.1 inches high, and 1.6 inches wide. It is sold with a removable crossbody strap. The KSO website describes it as being made of "Smooth Quilted Leather." It features four credit card slots, a slip pocket, and a snap closure. KSO does not provide other information regarding the quality or provenance of the materials used in constructing the Carey Bag, other than to state that the bag is imported.

64.     While the basis for the $329.00 "comparable value" price for the Carey Bag is known only to Defendants at this time, based on investigation of counsel, there were no bags with comparable size, features, and materials being sold at Woodburn Premium Outlets at the time of Plaintiff's purchase for anywhere near the ticketed "comparable value" price.

65.     Michael Kors Outlet currently sells a leather crossbody bag at a ticketed/regular price of $228.00, as shown in the image below.[5] The bag is made of 100 percent pebbled leather with silver-tone hardware. It measures 8.25 inches wide, 4.75 inches high, and 1.25 inches deep. On the exterior, it has a back slip pocket and a detachable crossbody strap. In the interior, it has eight credit card slots and two back slip pockets.



MICHAEL KORS OUTLET
Carson Large Pebbled Leather Convertible Crossbody Bag
$228   $71.20   68% OFF
EXTRA 20% OFF, PRICES AS MARKED
COLOR   BLACK

★ 4.6

66.     The "comparable value" price for the Carey Bag is so inflated that it is actually higher than the price of similarly designed but higher quality merchandise sold by KS. For example, while KS does not sell an exact match of the Carey Bag, it sells a crossbody bag with similar size, materials, and features in December 2025: the Deco Quilted Mini Flap Chain

---

[5] In *Binder v. Michael Kors (USA), Inc.*, the plaintiffs allege that reference prices used at Michael Kors Outlet stores are not prices at which the merchandise is ever offered for sale but instead function as illusory benchmarks untethered to any actual former or prevailing market prices.

Crossbody. The regular price of that bag is $298. KS did not sell "mini" size crossbody bag for more than $298 in December 2025.



67.    By presenting the Carey Bag with a $329 comparable value, Defendants conveyed that the bag was comparable in value to substantially similar handbags sold in the same geographic area at or around that price point. That price signal implied equivalence in quality, materials, and construction to higher-priced handbags, notwithstanding that the merchandise was manufactured specifically for outlet distribution.

68.    Defendants' unlawful price comparisons even extend to its printed receipts, which misstate the exact "savings" realized by the customer, both for each individual purchase and the transaction as a whole, by reference to fictitious "comparable value" prices. These unlawful price comparisons present fictitious "savings" and inflate the apparent discount off a stated reference price, thereby distorting the transaction price and making the amount paid appear lower relative to a benchmark that is not bona fide and rarely, if ever, an actual offering price for MFO Merchandise.

69.     On Plaintiff's receipt, shown below, Defendants made additional product pricing and value representations regarding the Products.



70.     The receipt listed the "comparable value" price, the applicable discount, and the effective sale price for each of the Products. For example, Defendants printed on the receipt that

the effective sale price for the Carey Bag was $78.96, and stated that the price represented a "SAVINGS" of $250.04 off the reference price of $329.00. These receipt representations treated the stated reference prices as the benchmark "comparable value," represented a quantified "SAVINGS" off that benchmark, and thereby communicated a specific transaction discount measured against a reference price that was not disclosed, not substantiated, and not a bona fide offering price for MFO Merchandise.

**D. Injunctive relief is necessary.**

71.    KSO's sales tactics give customers the wrongful impression that items are being offered at a substantial discount when, in reality, the stated reference price never applied.

72.    The underlying premise of a "comparable value" reference price is that the price represents a price at which substantially similar goods are offered by competitors in the relevant market. The purported discounts Defendants advertise are not the true discounts customers receive, and are often not discounts at all, because customers can always buy Defendants' products at the discount price.

73.    Plaintiff, who resides in Oregon, intends to shop at the KSO retail store location in Oregon in the future and is likely to be harmed again absent injunctive relief requiring compliant, substantiated comparative pricing and disclosure of the origin of any reference price.

74.    Plaintiff will be harmed in the future absent injunctive relief because Defendants' current practices withhold required origin and substantiation information for comparative prices, leaving consumers unable to verify whether a represented reference price satisfies Oregon's statutory and regulatory conditions.

75.    The unlawful practices and policies alleged herein, and experienced directly by Plaintiff, are not limited to any single product or group of products. Rather, Defendants' unlawful

advertising, sales practices, and printed sales receipts, which advertise and state false reference prices and false percentage-off and dollars-off discounts, were, and continue to be, systematic and pervasive across all of Defendants' products at its KSO stores in Oregon.

## CLASS ACTION ALLEGATIONS

### A.  Class Definition

76.    Plaintiff brings the asserted claims on behalf of the following proposed Class:

> All persons who, within the applicable statute of limitations period, purchased one or more KSO products in the State of Oregon at a discount to a ticketed comparative price.

77.    The applicable limitations period referred to by the class definition is expansive and extends back years based on the "delayed discovery" rule explicitly provided for in the Oregon Unlawful Trade Practices Act. *See* ORS 646.638(6). Defendants' unlawful false discounting practices have been pervasive at its Oregon stores—and have been at the core of its marketing plan—for many years (the exact length of time will be subject to discovery and proof). By design, the noncompliant pricing practices are impossible for the typical consumer to discover. Plaintiff and the Class did not know, and could not have known, that these ticketed reference prices and discount representations were noncompliant with ORS 646.883 and not within any enumerated exception under OAR 137-020-0010(6). Thus, the applicable limitations period—and the corresponding class period—extends back to the very first date that Defendants began engaging in the unlawful conduct alleged herein.

78.    Plaintiff reserves the right to expand, limit, modify, or amend the class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based on, *inter alia*, changing circumstances and new facts obtained.

Class Action Allegation Complaint          29

79.     The following people are excluded from the proposed Class: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

### B.  Numerosity & Ascertainability

80.     Members of the proposed Class are so numerous that their individual joinder herein is impracticable. The precise number of members of the class and their identities are unknown to Plaintiff at this time but may be determined through discovery. The Class may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendants.

### C.  Predominance of Common Questions

81.     Common questions of law and fact exist as to all members of the proposed Class, and those questions predominate over questions affecting only individual members. Common legal and factual questions include, but are not limited to: (a) whether Defendants' misconduct set forth in this Complaint violates the UTPA, and, if so, which specific subsections; (b) the products for which KSO uses "comparable value" pricing; (c) whether Plaintiff and the Class are entitled to injunctive or declaratory relief; and (d) whether Defendants should be ordered to pay statutory damages of $200 to Plaintiff and to each Class member. Defendants' "comparable value" representations are uniform across products and transactions, do not vary by consumer, and do not

depend on individualized evidence of any purchaser's subjective interpretation of the reference price, because the comparative price representations are uniform and operate at the point of sale.

### D.  Typicality

82.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff and members of the Class were harmed as a result of Defendants' uniformly illegal and unfair pricing practices.

### E.  Adequacy

83.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

### F.  Superiority

84.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of those issues. Finally, Defendants have acted or refused to act on grounds generally

applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive and declaratory relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Oregon Unlawful Trade Practices Act -- ORS §§ 646.605 et seq.
(By Plaintiff and the Class)**

85.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.     Plaintiff brings this cause of action on behalf of herself and members of the Class.

87.     Defendants are "persons" under the UTPA, as defined by ORS § 646.605(4). The definition of "person" includes "corporations," and as alleged above, Defendants are corporations.

88.     Defendants engage in the conduct of "trade" and "commerce" under the UTPA. Defendants do this by advertising, offering, and distributing goods in a manner that directly and indirectly affects people of the state of Oregon. ORS § 646.605(8). Defendants advertise and sell leather goods, handbags, accessories, and other goods at a retail store in Oregon and online, thereby serving and targeting a market for their products in Oregon. Due to Defendants' actions, the MFO Merchandise products have been marketed and sold to consumers in Oregon and harmed consumers in Oregon, including Plaintiff and the Class.

89.     Defendants' unlawful methods, acts, and practices described herein were committed in the course of Defendants' business. ORS § 646.608(1).

90.     The products advertised, offered, and sold by Defendants constitute "goods" that are or may be obtained primarily for personal, family, or household purposes, as defined by ORS § 646.605(6). Plaintiff and members of the Class purchased the products advertised by Defendants for personal, family, or household purposes.

91.     The KSO price tags, in-store signage, and online statements or representations regarding KSO's products and prices described in this complaint are "advertisements," as defined by ORS § 646.881(1). These statements and representations were made in connection with the solicitation of business.

92.     Defendants' advertisement and offering of sale prices and discounts based on or compared to ticketed "comparable value" price are "price comparisons," as defined by ORS § 646.881(2). These statements claim that the price offered to consumers reflects a reduction from a stated "comparable value" price.

93.     Defendants' use of "comparable value" reference prices constitutes a single course of conduct that gives rise to liability under multiple provisions of ORS 646.608. Each subsection alleged below addresses a distinct statutory prohibition triggered by the same conduct.

***ORS 646.608(1)(ee) violation based on failure to comply with ORS 646.883(1)***

94.     ORS 646.608(1)(ee) provides that "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person … [v]iolates ORS 646.883 or 646.885." A failure to comply in full with ORS 646.883 or ORS 646.885 thus constitutes a per se violation of ORS 646.608(1)(ee).

95.     Defendants violate ORS 646.608(1)(ee) by failing to "clearly and conspicuously identif[y] in the advertisement the origin of the price that the seller is comparing to the seller's current price." ORS 646.883(1). Defendants' advertisements display "comparable value" prices but fail to identify the origin of those prices, such as whether the prices reflect a specific competitor's current price for a substantially similar item available in the Oregon market.

***ORS 646.608(1)(ee) violation based on failure to comply with ORS 646.883(2)***

96.     Separately, Defendants violate ORS 646.608(1)(ee) by advertising price comparisons that are not in compliance with ORS 646.883(2).

97.     ORS 646.883(2) provides that retail price comparisons must (a) comply with ORS 646.608(1)(j), (b) comply with rules adopted under ORS 646.608(4), including OAR 137-020-0010(6), and (c) be based on facts provable by the seller.

98.     Defendants' "comparable value" price advertisements do not satisfy these requirements. The "comparable value" prices are not prices at which an identified or identifiable competitor in Defendants' geographic market area has, in the recent regular course of its business, offered to make good-faith sales of the same or similar goods within the meaning of OAR 137-020-0010(6)(c), and Defendants lack facts provable by the seller that would satisfy ORS 646.883(2)'s substantiation requirement.

99.     Defendants thus violate OAR 137-020-0010(6) and ORS 646.608(1)(j). By extension, Defendants' price comparisons do not comply with ORS 646.883(2), which independently establishes liability under ORS 646.608(1)(ee).

***ORS 646.608(1)(ee) violation based on failure to comply with ORS 646.885***

100.    Separately, Defendants violate ORS 646.608(1)(ee) by failing to comply with ORS 646.885(1), which states that price comparison "terms such as 'regular,' 'reduced,' 'sale,' 'usually,' 'originally,' 'clearance,' 'liquidation' and 'formerly' shall identify the origin of the price that the seller is comparing to the seller's current price as the seller's own former price, or in the case of introductory advertisements, the seller's future price."

101.    While Defendants run near-constant "sale" or discount prices for MFO Merchandise, Defendants do not identify "the origin of the price" being compared to the prevailing

sale price. Defendants routinely advertise both category-specific and storewide "sales" and "percent-off" promotions but never disclose the actual basis for the reference prices, leaving customers without information necessary to determine whether the offered price reduction is lawful or genuine or whether the products are actually worth the prices offered. The term "comparable value," on its own, is meaningless because it does not tell consumers what that price is—the seller's current price, a former price, or a bona fide competitor price.

102.    Because ORS 646.885(1) imposes an origin identification obligation whenever the seller uses the word "sale" or advertises a percentage-off discount, and because KSO's advertisements for MFO Merchandise do not identify the price being compared, Defendants violate ORS 646.885, which independently establishes liability under ORS 646.608(1)(ee).

### ORS 646.608(1)(j) violation

103.    Defendants' failure to comply with ORS 646.608(1)(j) and the implementing rule establishes a violation of ORS 646.883 and thus liability under ORS 646.608(1)(ee). In addition, ORS 646.608(1)(j) provides an independent basis for liability for the same conduct.

104.    Through their systematically unlawful price comparison policy, Defendants made "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions," in violation of ORS § 646.608(1)(j). Defendants did so by advertising false reference prices for MFO Merchandise that conveyed to consumers that the stated prices reflected bona fide market prices for other goods that are similar in all material respects. In truth, the ticketed prices were inflated and fictitious prices that never apply to MFO Merchandise. Moreover, because the "comparable value" prices were set uniformly across all KSO stores nationwide and never adjusted for local competitor pricing, they cannot satisfy Oregon's geographic-market requirement.

*ORS 646.608(1)(u) violation*

105.     Defendants violated ORS 646.608(1)(u) because OAR 137-020-0010(6) defines as unfair or deceptive any reference-price advertisement that does not fall within an enumerated exception, and Defendants' "comparable value" prices do not meet the requirements of the exception in subsection (6)(c). The alleged violation of subsection (1)(u) is based solely on Defendants' violation of OAR 137-020-0010(6), which defines as unfair or deceptive any reference-price advertisement that does not fall within an enumerated exception.

*ORS 646.608(1)(e) violation*

106.     Defendants represent that MFO Merchandise items have characteristics or qualities that they do not have, in violation of ORS 646.608(1)(e).

107.     Defendants' "comparable value" representations necessarily convey parity in quality between MFO Merchandise and the higher-quality merchandise sold by KS and by KS's (as opposed to KSO's) direct competitors, which provide the apparent basis for the reference prices. Defendants implicitly represent that the MFO Merchandise embody the same qualities and characteristics as goods offered at the purported comparator prices. This equivalence is inaccurate because MFO Merchandise is made to a lower quality standard than the merchandise offered at the comparator prices Defendants invoke. In each case, Defendants represent that the value of MFO Merchandise is greater than it actually is by advertising fictitious discounts and illusory sales for the products.

*ORS § 646.608(1)(s) violation*

108.     Defendants make "false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services," in violation of ORS 646.608(1)(s).

109.    The "comparable value" prices advertised on KSO price tags and other advertisements do not correspond to the offering prices of substantially similar goods in the Oregon market. These prices—as well as the phrase "comparable value" itself—are false or misleading representations of fact concerning the offering price of the products. A proper baseline for establishing the extent of a discount would be the regular prevailing prices for the same products at KSO stores or the store of an identified or identifiable competitor (and not the prices of higher quality items sold by KS or its competitors). In addition, the purported price reductions are not true price reductions.

*Willful, reckless, and knowing violations*[6]

110.    Defendants' unlawful methods, acts, and practices described above were willful violations within the meaning of ORS 646.605(10) because Defendants knew or should have known that their "comparable value" pricing practices did not comply with Oregon's reference-pricing statutes and rules.

111.    Defendants knew or should have known their conduct was unlawful because, among other things, Oregon law expressly prohibits comparative price advertising that does not identify the origin of the compared price and that is not based on prices offered by identified or identifiable competitors in the seller's geographic market area, yet Defendants continued to use uniform, nationwide "comparable value" prices in Oregon without making those disclosures or tying them to Oregon competitors.

112.    In addition, for purposes of ORS 646.638(8)(a), Defendants' use of "comparable value" pricing in Oregon was reckless or knowing. Defendants continued to employ the same

_____

[6] Defendants' willful, knowing, or reckless conduct is alleged solely for purposes of remedies under ORS 646.638 and is not an element of liability.

opaque, non-competitor-based "comparable value" pricing model after being sued repeatedly for the same practice in other jurisdictions and after decisions applying Oregon's UTPA to similar "comparable value" schemes, yet they made no effort to conform their Oregon pricing practices to Oregon's stricter requirements.

113.    Defendants' willful, reckless, and knowing use or employment of unlawful reference-price practices entitles Plaintiff to recover actual damages or statutory damages under ORS 646.638(1) and entitles the Class to recover statutory damages under ORS 646.638(8)(a).

*Ascertainable loss*

114.    Defendants' unlawful trade practices caused Plaintiff and Class members to suffer ascertainable loss, as required by ORS 646.638(1).

115.    Defendants' uniform and noncompliant price representations distorted the transaction prices of MFO Merchandise sold in Oregon by creating the appearance of genuine comparative discounts that did not exist. As a result of that distortion, Plaintiff and Class members paid more for MFO Merchandise than they otherwise would have paid in the absence of Defendants' unlawful pricing practices.

116.    Defendants were thus able to fetch a higher market price than they would have but for their illegal conduct, which caused every consumer (regardless of whether they relied upon or even saw the price representations) to pay more as a result of Defendants' illegal actions.

117.    Plaintiff and Class members therefore suffered ascertainable loss in the form of an overpayment or price premium attributable to Defendants' unlawful price representations. That loss is measurable as the difference between the prices actually paid and the prices that would have prevailed absent Defendants' unlawful comparative price advertising.

118.    Independently, Plaintiff and Class members suffered ascertainable loss when Defendants caused them to enter into retail transactions that Oregon law prohibits. Defendants were not legally entitled to consummate sales based on comparative price advertisements that failed to comply with, among other provisions, ORS 646.883, ORS 646.885, and OAR 137-020-0010(6), and the payment of money in those transactions constitutes an ascertainable loss regardless of individualized reliance.

119.    Under Oregon law, Defendants' price-comparison advertisements were prohibited unless they satisfied each of the conditions set forth in ORS 646.883 and OAR 137-020-0010(6). As alleged herein, Defendants' advertisements did not satisfy those conditions. Every sale of a product accompanied by a noncompliant "comparable value" advertisement was therefore a transaction that Defendants were not permitted to consummate under Oregon law. Plaintiff and Class members suffered ascertainable loss when they paid money in connection with those prohibited transactions. This loss is equal to the full amount paid because the transactions should not have occurred in the form in which they were consummated—i.e., with pricing derived from unlawful reference-price advertisements. This theory does not require proof that any individual consumer relied on, or was even aware of, the noncompliant reference price, because the illegality inheres in the advertisement itself, not in the consumer's subjective response to it.

120.    In the alternative, to the extent actual damages require further quantification, Plaintiff and Class members seek statutory damages as authorized by ORS 646.638(1) and (8).

***Statute of limitations***

121.    This action was brought "within one year after the discovery of the unlawful method, act or practice." ORS 646.638.

122.    Under ORS 646.638(6), the limitations period is subject to delayed discovery. Plaintiff and the Class did not know, and could not reasonably have known, that Defendants' reference-price representations were unlawful because the basis for the "comparable value" prices was neither disclosed nor discernible to consumers. Defendants' pricing practice was self-concealing because only Defendants possessed information about the origin and substantiation of the reference prices, and consumers had no practical means of determining whether the represented comparisons complied with Oregon law. The nature of the unlawful practice rendered discovery impossible without access to Defendants' internal pricing rationale or reference-price substantiation, neither of which is accessible to consumers. As a result, absent class members will learn of the practice for the first time upon class notice.

123.    This action is therefore timely under ORS 646.638(1) and (6).

*Relief*

124.    Plaintiff seeks, for herself and all Class members, (a) the greater of statutory damages of $200 or actual damages, (b) punitive damages, (c) appropriate equitable and declaratory relief, and (d) attorneys' fees and costs. ORS 646.638(3); 646.638(8).

125.    Monetary relief alone cannot remedy the ongoing nature of Defendants' unlawful trade practices, which are uniformly applied to every consumer who enters KSO outlet stores in Oregon. Absent injunctive and declaratory relief, Plaintiff and the Class will continue to be subjected to the same unlawful representations. Injunctive relief is therefore necessary and properly sought under ORS 646.638(1) and Federal Rule of Civil Procedure 23(b)(2).

126.    Pursuant to ORS 646.638(1), Plaintiff seeks injunctive relief to restrain Defendants from engaging in the unlawful trade practices described herein, together with declaratory relief confirming that Defendants' reference-price advertising practices violate Oregon law.

127.     Defendants' use of the "comparable value" legend on the price advertisements for MFO Merchandise violates ORS 646.883(1) and ORS 646.608(1)(ee) because the advertisements do not clearly and conspicuously identify the origin of the compared price. Accordingly, Plaintiff seeks an injunction restraining Defendants from using such reference-price representations unless each advertisement containing a "comparable value" price clearly and conspicuously identifies the origin of the compared price.

128.     ORS 646.883(2) requires that any reference price advertised in Oregon be supported by facts "provable by the seller," including documentation of the origin of the compared price and verification that the price reflects bona fide competitor offerings under OAR 137-020-0010(6)(c). Accordingly, Plaintiff seeks an injunction requiring Defendants to maintain contemporaneous reference-price substantiation consistent with the statute's requirements.

129.     Oregon law requires reference prices to be based on an identified or identifiable competitor in the seller's geographic market area. OAR 137-020-0010(6)(c). Defendants' practice of applying uniform national "Comparable Value" prices, without regard to any Oregon-specific competitor, violates this requirement. Accordingly, Plaintiff seeks an injunction restraining Defendants from using reference prices in Oregon that are not based on Oregon-specific competitor pricing consistent with OAR 137-020-0010(6)(c).

130.     A declaration is appropriate because a present, actual controversy exists regarding Defendants' ongoing use of reference-price representations that violate ORS 646.883, ORS 646.608(1)(ee), and OAR 137-020-0010(6). Plaintiff seeks a judicial declaration that Defendants' conduct violates these provisions.

## COUNT II
## Unjust Enrichment
## (By Plaintiff and the Class)

131.    Plaintiff incorporates the factual allegations above only to the extent they are consistent with this claim.

132.    Plaintiff pleads this claim in the alternative under Rule 8(d)(2) and (3). As such, Plaintiff seeks relief only to the extent statutory remedies under the Oregon UTPA are deemed unavailable or inadequate.

133.    Even if Defendants' price-comparison practices are not deemed to violate the UTPA, Defendants nonetheless received and retained a monetary benefit from Plaintiff and Class members when they charged transaction amounts determined by fabricated or unsubstantiated "Comparable Value" reference prices.

134.    Plaintiff and Class members conferred a monetary benefit on Defendants when they purchased merchandise priced using fabricated or unsubstantiated "Comparable Value" reference prices. Defendants accepted and retained this benefit because they set and applied those prices in the ordinary course of their pricing practices and collected the resulting transaction amounts. Under these circumstances, it would be inequitable for Defendants to retain the benefit, particularly if statutory remedies are unavailable or inadequate.

135.    In the alternative only, the transactions at issue are void or voidable because they were induced by representations that rendered the resulting exchanges inequitable.

136.    Plaintiff and the Class seek restitution, disgorgement, and, in the alternative, rescission.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of herself and the proposed Class, Plaintiff requests that the Court order relief and enter judgment against Defendants as follows:

a) Declare this action to be a proper class action, certify the proposed Class, and appoint Plaintiff and her counsel to represent the Class;

b) Declare that the delayed discovery rule, pursuant to, without limitation, ORS 646.638(6), applies and that the applicable limitations period—and the corresponding class period— extends back to the very first date that Defendants began engaging in the unlawful conduct alleged herein;

c) Declare that Defendants' use of "Comparable Value" price tags without identifying the origin of the compared price violates ORS 646.883 and ORS 646.608(1)(ee);

d) Enjoin Defendants from using any comparative reference price in Oregon that is not derived from Oregon-specific competitor prices for substantially similar goods, as required by ORS 646.883 and OAR 137-020-0010(6)(c);

e) Enjoin Defendants from using "Comparable Value," "Compare At," or any comparative price representation on price tags or in-store advertisements in Oregon unless each advertisement independently identifies the origin of the compared price and the compared price satisfies all requirements of ORS 646.883 and OAR 137-020-0010, including the requirement that the reference price reflect the bona fide price charged by an identified or identifiable competitor in Defendants' geographic market area for substantially similar goods;

f) Require Defendants to maintain, for a period of three years, contemporaneous records demonstrating the origin of every comparative reference price used in Oregon as required

by ORS 646.883, including (1) the identity of the competitor relied upon; (2) the substantially similar item offered by that competitor; (3) the price at which the competitor offered the item in the recent regular course of business; and (4) the basis for determining that the competitor item and Defendants' item are similar in each significant aspect, consistent with OAR 137-020-0010(5)(g);

g)   Order Defendants to pay statutory damages of $200 or actual damages, whichever is greater, to Plaintiff and each member of the Class, pursuant to, without limitation, ORS 646.638(1) and 646.638(8)(a);

h)   Order Defendants to pay punitive damages to Plaintiff and each member of the Class in an amount to be determined at trial, pursuant to, without limitation, ORS 646.638(1) and 646.638(8)(b);

i)   Order Defendants to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

j)   Order any other relief to which Plaintiff and members of the Class are justly entitled.

## JURY DEMAND AND NOTICE TO ATTORNEY GENERAL

Plaintiff and the Class demand a trial by jury on all issues so triable. Further, upon filing of this action, this Complaint shall be mailed to the Attorney General of the State of Oregon, and proof of receipt of same shall be filed with the Court.

Respectfully submitted,

Dated: March 5, 2026            */s/ Ryan Casey*
                               M. Ryan Casey (he/him), OSB # 152824
                               THE CASEY LAW FIRM, LLC
                               358 Blue River Pkwy Unit E-417
                               Silverthorne, CO 80498
                               Email: ryan@rcaseylaw.com

Gillian Wade (she/her)
    (*pro hac vice* forthcoming)
WADE KILPELA SLADE LLP
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
Tel: (310) 667-7273
Fax: (424) 276-0473
Email: gwade@waykayslay.com

Edwin J. Kilpela, Jr. (he/him)
    (*pro hac vice* forthcoming)
WADE KILPELA SLADE LLP
6425 Living Place, Suite 200
Pittsburgh, PA 15206
Phone: (412) 314-0515
Email: ek@waykayslay.com

Evan E. North (he/him)
    (*pro hac vice* forthcoming)
NORTH LAW PLLC
1900 Market Street, Suite 800
Philadelphia, PA 19103
Phone: (202) 921-1651
Email: evan@northlawpllc.com

*Attorneys for Plaintiff and the Proposed Class*